[No. 37217. En Banc. November 4, 1965.]

WILLIAM L. BASKE et al., *Appellants*, v. ARTHUR M. RUSSELL, JR., et al., *Respondents*.*

*Dimmick, Sampson & Savage,* by *Theodore E. Sampson,* for appellants.

*Ostrander & Van Eaton* and *Ralph I. Thomas,* for respondents.

ROSELLINI, C. J.—The plaintiffs Baske had money to invest and on occasion had purchased notes from Stevens-Norton, Inc. The plaintiff William L. Baske (hereafter referred to as plaintiff) stopped in at that company's place of business, and expressed his desire to purchase some

*Reported in 407 P.2d 434.

accounts. Stevens-Norton suggested that he purchase the "Russell account." The plaintiff gave his check for $5,640 for that $6,000 account. He was unaware that the money which he was advancing was to be the original consideration for the note and mortgage.

The defendant Arthur M. Russell, Jr. (hereafter called the defendant) being hard pressed by creditors, had applied to Stevens-Norton, Inc., for a loan, offering as security a second mortgage on his family residence. The defendant was advised by an agent of that company that he and his wife would be required to sign a note and mortgage made payable to a "third party"; and to fill that role, the defendant's mother-in-law was suggested. The defendant complied with the directions of Stevens-Norton, he and his wife signing the note and mortgage in blank, and having his mother-in-law, Maude K. Henderson, assign the note and mortgage in blank.

The note, payable in monthly installments of $100 or more, bore interest at 10 per cent per annum with penalty for late payments, and was to be paid in full in 3 years. The funds paid over to Stevens-Norton by the plaintiff were disbursed at the direction of the defendant, except for a "discount" of $1,250, which was deducted from the amount of the loan by Stevens-Norton. The difference between this amount and the amount of the plaintiff's discount was pocketed by the agents of Stevens-Norton as a commission. The net amount made available to the defendant was $4,750. After the defendant had repaid $550 of this amount, he defaulted. This action was brought to foreclose the mortgage. By his answer, the defendant raised the defense of usury, which was sustained by the trial court upon its finding that the deduction of $1,250 made the interest greater than the maximum allowed by law, and its conclusion that the plaintiff was chargeable with knowledge of the true nature of the transaction.

Here the only consideration or thing of value paid for the note and mortgage was furnished by the plaintiff, although he was unaware of it.

The mother-in-law of defendant who was the payee on the note and the named mortgagee did not receive any money. The note and mortgage were never delivered to her. She thought she was an accommodation endorser. The trial court in its memorandum opinion characterized the mother-in-law as "simply a dummy put in there in order to try and insulate them from the results of their wrongdoing."

The problem presented where a note which has had no prior inception is sold at a usurious discount, is not a new one. The cases are annotated in 165 A.L.R. 626, under the title, "Usury as predicable upon transaction in form a sale or exchange of commercial paper or other choses in action." At page 628, the writer quotes the following general rule from 55 Am. Jur., *Usury* § 12:

"The definition of usury imports the existence of certain essential elements generally enumerated as (1) a loan or forbearance, either express or implied, of money, or of something circulating as such; (2) an understanding between the parties that the principal shall be repayable absolutely; (3) the exaction of a greater profit than is allowed by law; and (4) an intention to violate the law. The presence of these elements infallibly indicates usury irrespective of the form in which the parties put the transaction; on the other hand, the absence of any one of them conclusively refutes the claim of usurious practice. In order that a transaction be considered usurious, these elements must exist at the inception of the contract, since a contract which in its inception is unaffected by usury can never be invalidated by any subsequent usurious transaction. It is the agreement to exact and pay usurious interest, and not the performance of the agreement, which renders it usurious. The test to be applied in any given case is whether the contract, if performed according to its terms, would result in producing to the lender a rate of interest greater than is allowed by law, and whether such result was intended."

This court has held that the elements listed in this quotation are essential under our statute. *Hafer v. Spaeth,* 22 Wn.2d 378, 156 P.2d 408.

A sale of commercial paper or other chose in action can-

not be construed as usurious, regardless of the profit made, unless it constitutes in reality a device for the exaction of illegal interest; and in order to establish the latter, it is necessary to produce sufficient competent evidence of the existence of all of the elements of usury. *Acme Finance Co. v. Zapffe*, 161 Wash. 312, 296 Pac. 1050.

■ As stated in the A.L.R. annotation, it is equally well settled as a complementary proposition that if it becomes apparent that the purpose or intention of a transaction, in form a sale, or involving a similar transfer, was to make a loan or effect a forbearance for a consideration constituting an oppressive exaction the transaction will be fully analyzed with a view to determining whether it is usurious in character.

In the case before us, the evidence shows that the plaintiff did in fact provide the money for a loan, although he was unaware of it. The trial court found that the loan was usurious, and that finding has not been questioned on appeal. Insofar as matters appeared to the plaintiff, the note showed an interest rate of 10 per cent. He exacted a 6 per cent discount, in purchasing the note. If this 6 per cent were spread over the 3 years in which the note was to be paid, the annual interest would be 12 per cent—a rate not in excess of that provided by statute; however, when it is considered that the interest is paid on a declining balance, whereas the 6 per cent was deducted from the full amount of the loan, it becomes apparent that the statutory maximum would be exceeded.

We again quote from 165 A.L.R. at 641:

Although the term "discount" has different meanings, both in law and business practice, the kind here contemplated, particularly in the usage of banks, is a sale of an instrument evidencing a monetary obligation for an amount less than its face or nominal value, and the cases considered, for the most part, involve transactions in the form of such a sale which are claimed to simulate the form in an effort to conceal usury.

And at page 642:

If a note is offered for discount by the maker, it is plainly usurious, as between him and the party to whom

it is delivered, if the discount from its face value is greater than the rate of interest allowed upon a loan. 1 Daniel, Negotiable Instruments, § 753.

It is a general rule that where a commercial instrument or other transferable chose in action is discounted in a transaction wherein it is received from the maker, or previous to negotiation for value, it constitutes the maker's obligation, or one without valid inception, the sale or transfer of which, at a discount in excess of lawful interest, is in legal effect a usurious loan.

And on page 645, it is said:

Where the first negotiation of commercial paper or similar choses in action is for money at a usurious rate of discount to one who knows the paper had no prior inception, it is usurious, being a loan and not a sale. But where transfer is made to one who has no actual or constructive knowledge that the paper is new, the authorities are not agreed upon the question.

As the writer of the annotation observes, the result in a given case must depend upon the specific wording and proper scope of the usury statute, although the cases construing similar statutes are not always consistent. It would serve no useful purpose to discuss these cases here. They can be found in the annotation. In general, the courts which have held the innocent transferee subject to the defense of usury have done so on the theory that the knowledge of the transferee is immaterial, since the applicable statute makes the usurious contract void. Examples are *Eastman v. Shaw*, 65 N.Y. 522 (1875), and *Campbell v. Nichols & Tompkins*, 33 N.J.L. 81 (1868).

Our statute does not make the contract void but simply imposes penalties. However, we do not think that a distinction based upon the severity of the sanctions imposed by a statute is necessarily valid.

The purpose of the statute is to discourage and penalize the exaction of usury in making a loan. If knowledge on the part of the lender is made a condition of liability, collusion is invited and the purpose of the statute is defeated.

The defendant in this case was in need of money. He was never told what interest he was to pay; he thought he was to pay the legal rate. When the money was disbursed to him, he first found that he was being charged $1,250 for the loan. Finding himself in an economic squeeze, he did what man has done throughout history—accepted the oppressive terms of usurious interest. This is an evil that the usury statute attempts to prevent. It is designed to protect those who by adversity and necessity of economic life are driven to borrow money at any cost. The protection granted is based on the fact that many borrowers are powerless to resist the avarice of the money lenders.

We hold that a note for which value has once been given can be discounted at any rate, but that the discount of paper for which no value has been previously given must be added to the interest provided for in determining the interest rate, and if this exceeds the rate of interest allowed by the statute, the defense of usury is available.

The judgment is affirmed.

DONWORTH, FINLEY, HAMILTON, and HALE, JJ., concur.

OTT, J. (dissenting)—The undisputed facts in this case are these: Stevens-Norton, Inc., is an investment broker corporation doing business in Seattle. On or about April 21, 1961, the broker, as agent for Maude K. Henderson, offered for sale at a 6 per cent discount an installment note, in which she was designated as payee. The note, signed by Arthur M. Russell, Jr., and Jane H. Russell, his wife, as makers, was in the principal sum of $6,000, and bore interest at the rate of 10 per cent per annum. It was dated April 14, 1961, and the first monthly payment of $100 was due and payable May 28, 1961. The note was secured by a second mortgage on certain real estate belonging to the Russells. The mortgage was recorded in the office of the county auditor April 21, 1961.

William L. Baske and wife accepted the offer and paid Stevens-Norton, Inc., $5,640 for the $6,000 note. May 2, 1961, 26 days before the maturity date of the first install-

ment payment on the note, Maude K. Henderson endorsed the note as follows:

> FOR VALUE RECEIVED and without recourse this note is assigned together with mortgage securing the same to WILLIAM L. BASKE & LILLIAM [sic] A. BASKE, his wife.

May 3rd, she executed a written assignment of her mortgage, which was recorded in the office of the King County Auditor on May 5, 1961.

December 22, 1961, the Russells being in default in the payment of the monthly installments, the Baskes commenced this action to recover from the Russells the balance due on the note in the approximate sum of $5,751.66, and to foreclose the mortgage.

The trial court held that the note was subject to the defense of usury and, after deducting the penalties for a usurious contract, entered judgment in favor of plaintiffs for $1,808.01, and ordered that the mortgage lien be foreclosed. The majority sustain the judgment.

I do not agree with the conclusion of the majority for the following reasons:

(1) The majority concede that William Baske and wife were innocent purchasers of a negotiable instrument for which they paid a valuable consideration before maturity, and that they were unaware of the transactions between the Russells and Maude K. Henderson, and Stevens-Norton, Inc. The majority opinion disregards and ignores the negotiable instruments law of this state.

RCW 62.01.057 provides:

> A holder in due course holds the instrument *free from any defect of title of prior parties, and free from defenses available to prior parties among themselves,* and may enforce payment of the instrument for the full amount thereof against all parties liable thereon. (Italics mine.)

A negotiable instrument purchased before maturity in due course of business is, by statute, not subject to the defense of usury. *Motor Contract Co. v. Van Der Volgen,* 162 Wash. 449, 298 Pac. 705, 79 A.L.R. 29 (1931); *Fry v. Knouse,* 142 Wash. 500, 253 Pac. 802 (1927); *American*

*Sav. Bank & Trust Co. v. Helgesen,* 64 Wash. 54, 116 Pac. 837 (1911).

One is a holder in due course of a negotiable instrument when (1) it is complete and regular on its face, (2) it is purchased before maturity, (3) it is purchased in good faith, and (4) it is purchased without knowledge of infirmity in the instrument. *Garner v. F. T. Crowe & Co.,* 138 Wash. 584, 244 Pac. 970 (1926).

The note, as well as the mortgage, in the instant case is complete and regular on its face. The note and mortgage were executed by the makers, payable to Maude K. Henderson, were delivered to Stevens-Norton, Inc., for sale, and were sold prior to maturity.

All of the elements necessary to establish that the Baskes were holders of a negotiable instrument in due course are here present. The uniform negotiable instruments act provides that instruments purchased in due course are "free from any defect of title of prior parties, and free from defenses available to prior parties among themselves."

(2) The majority, after ignoring the negotiable instruments law of this state, embark upon a new concept of the law of contracts. They say that William Baske *"was unaware that the money which he was advancing was to be the original consideration for the note and mortgage."* (Italics mine.) They conclude that Mr. Baske was in fact the lender, *"although he was unaware of it."* (Italics mine.)

The majority, by this opinion, have not only wrecked the negotiable instruments law of this state but the law of contracts as well. How is it legally possible to enter into a binding contract and be "unaware of it"?

The basic element involved in making a legal contract is that there must be a meeting of the minds of the parties to the contract. There is not a scintilla of evidence in this record that the Baskes, either expressly or impliedly, ever agreed to loan the Russells any money. Since there was no meeting of minds in this regard, the relationship of borrower and lender, as between the Baskes and the Russells, is not present in this case.

The majority's conclusion that one can enter into a contract to loan money to another and be "unaware of it" finds no support in the law of contracts or of negotiable instruments.

(3) In disregard of the facts, the majority hold that the Russells were offering to borrow money from any lender at a usurious rate of interest. After making this erroneous factual determination, the majority cite 165 A.L.R. at 642, which states that "If a note is offered for discount by the *maker*," the stigma of usury attaches. Mrs. Henderson, in the instant case, was *not* the *maker* of this note and mortgage. She was the payee, and, as such, she sold her note and mortgage to the Baskes through her broker, Stevens-Norton, Inc.

It is the law of this state that the owner and payee of a negotiable instrument may sell his security at a discount and such transaction is not usurious. *Acme Finance Co. v. Zapffe,* 161 Wash. 312, 296 Pac. 1050 (1931). In the cited case, the note was discounted 12 per cent, and in the instant case, the discount to the purchaser was only 6 per cent.

(4) It is the established law of this state that factual issues are resolved in the trial court, yet, in total disregard of this well established rule, the majority find that "She [Mrs. Henderson] thought she was an accommodation endorser." The trial court made no such finding and the evidence is entirely to the contrary. Her name appears in the note as "payee." She assigned the note, as named payee, to the Baskes. As payee, she executed a separate assignment of the mortgage, which was recorded. These written instruments establish conclusively that Mrs. Henderson knew that she was the payee mentioned. Her conduct certainly was not that of an accommodation endorser, and there is nothing in the record to sustain this factual determination made by the majority.

Whether one has loaned money to another, thereby becoming a lender, is a factual determination. The trial court did not find that the Baskes had loaned any money to the Russells; nor did the Russells testify that they thought

they had borrowed any money from the Baskes. There is no evidence in this record to sustain the conclusion of the majority that the relationship of borrower and lender existed between the Russells and the Baskes.

(5) The majority put their stamp of approval on *deceit* and *misconduct*. It is conceded that the Russells and Mrs. Henderson entered into an illegal transaction, in that the Russells knowingly executed a note and mortgage to Mrs. Henderson for which she gave no consideration. In furtherance of their deceptive conduct, the mortgage was recorded so that it gave notice to the world that Mrs. Henderson was the owner of a second mortgage on the Russells' property. To accomplish their fraudulent design, they then offered to sell the note and mortgage through their broker, Stevens-Norton, Inc., at a 6 per cent discount. The Baskes were not aware of this subterfuge, and were innocent purchasers for value.

The majority state: "The net amount made available to the defendant [Russell] was $4,750. After the defendant had repaid $550 of this amount, he defaulted." The court awarded judgment against the Russells in the sum of $1,808. Therefore, the Russells were unjustly enriched, as a result of their own misconduct, in the amount of $2,392.

In *Sinnar v. LeRoy*, 44 Wn.2d 728, 731, 270 P.2d 800 (1954), we said: "A court will not knowingly aid in the furtherance of an illegal transaction, but will leave the parties where it finds them."

It has never been the policy of this court to reward dishonesty and penalize the victim. *Scroggin v. Worthy*, 51 Wn.2d 119, 316 P.2d 480 (1957); *Wooddy v. Benton Water Co.*, 54 Wash. 124, 102 Pac. 1054 (1909).

I agree with the majority that the commission charged by Stevens-Norton, Inc., is an unconscionable fee. However, regulation of these investment brokers is a legislative matter. If the Russells and Mrs. Henderson were overreached by their agent, they have a cause of action against Stevens-Norton, Inc.

For the reasons stated, the judgment of the trial court should be reversed.

HILL, WEAVER, and HUNTER, JJ., concur in the result of the dissent.